FAGG, Circuit Judge.
Appellants (debtors) are farmers in North Dakota who have filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. They appeal from the district court’s decision barring them from selling grain, stored on their property but mortgaged to Commodity Credit Corporation (CCC), and using the cash proceeds to finance their 1984 farming operations. CCC is an agency of the United States government whose primary purpose is to stabilize, support, and protect the agricultural commodities market. See 15 U.S.C. § 714. In reversing the bankruptcy court’s decision allowing the debtors to sell the grain and use the cash collateral, the district court held that debtors’ offer of a first lien on the 1984 crop, plus an assignment of Federal Crop Insurance proceeds, was not “adequate protection” of CCC’s security interest within the meaning of the Bankruptcy Code. 11 U.S.C. § 361. Because we find that the bankruptcy court applied an incorrect legal standard in making its “adequate protection” determination and did not properly consider relevant factors affecting CCC’s security interest, we remand to the district court with instructions to remand to the bankruptcy court for further analysis in light of this opinion.
Facts
After filing their petitions for reorganization, debtors attempted to secure loans from various lending institutions within their community in early 1984 for the purpose of continuing their farming operations. When their applications for loans were rejected, debtors filed motions in bankruptcy court requesting the use of cash collateral to finance the planting and harvesting of the 1984 crop. In order to obtain the needed cash, debtors proposed to sell the grain in storage bins mortgaged to CCC. In return, debtors offered to give CCC a first lien on the 1984 crop and assign to CCC the proceeds of Federal Crop Insurance policies.
The bankruptcy court held a hearing on each motion. Debtors estimated the value of the 1984 crop yield primarily using data from previous years of their farming operations. On the basis of these estimates, *474 the debtors concluded that after the crop was harvested, the value of the 1984 crop would exceed in value the amount of collateral being requested. After the hearings, the bankruptcy court granted debtors’ motions in separate orders, authorizing a sale of the grain and debtors’ use of the cash collateral to the extent of the protection afforded CCC under the Federal Crop Insurance policy. Without further analysis, the bankruptcy court found that because of CCC’s first lien on the 1984 crop and the assignment of crop insurance proceeds to CCC, “it is virtually certain * * * that [CCC] will be insured a return of its interest.” See In re Nikolaisen, 38 B.R. 267, 270 (D.N.D.1984).
CCC immediately filed its notice of appeal to the United States District Court. One week later, the court issued a stay of the bankruptcy court’s order pending appeal under Rule 8005 of the Bankruptcy Rules. The district court reversed the bankruptcy court’s orders on May 24, 1984, holding that debtors’ offer simply did not constitute adequate protection of CCC’s security interest. See In re Berg, 42 B.R. 335, 338 (D.N.D.1984).
Mootness Question
At the outset, we address the issue of whether debtors’ claims are moot. Debtors filed their motions for use of cash collateral in March of 1984 to plant and harvest their 1984 crop. Their cases were not argued orally before this court until December of 1984, well after the 1984 harvesting season.
We believe this case falls within the “capable of repetition, yet evading review” exception to the mootness rule. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 602-03, 102 S.Ct. 2613, 2617-18, 73 L.Ed.2d 248 (1982); Flittie v. Erickson, 724 F.2d 80, 82 (8th Cir.1983). The 1984 harvesting season was over before this court could consider debtors’ claims. Debtors are still in reorganization under Chapter 11, and there exists a reasonable expectation that the controversy will recur. Under these circumstances, we conclude that debtors’ claims present a justiciable controversy.
Standard of Review
The bankruptcy court’s findings of fact are not to be overturned unless clearly erroneous; however, its conclusions of law are subject to de novo review. In re Comer, 723 F.2d 737, 739 (9th Cir.1984). We recognize that although some courts have held that the issue of adequate protection is a conclusion of law, In re Philadelphia Consumer Discount Co., 37 B.R. 946, 949 (E.D.Penn.1984); In re Schaller, 27 B.R. 959, 962 (W.D.Wis.1983), other courts have held it to be one of fact, In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir.1984); In re Jim Kelly Ford of Dundee, Ltd., 14 B.R. 812, 816 (N.D.Ill.1980). Upon reviewing the legislative history, we agree with the line of cases that have held that adequate protection is a question of fact.
The concept of adequate protection was designed to “insure that the secured creditor receives the value for which he bargained.” S.Rep. No. 989, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5839 (emphasis added); see also H.R.Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6295. Congress explicitly stated that value was to be considered a flexible concept “to permit the courts to adapt to varying circumstances and changing modes of financing,” and that such matters “are [to be] left to case-by-case interpretation and development.” H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295; see also S.Rep. No. 989 at 54, 1978 U.S.Code Cong. & Ad. News at 5840. Because Congress intended that value was to be determined on a case-by-case basis, that which is designed to protect value, i.e., adequate protection, must also be determined on a case-by-case basis, permitting the debtors “maximum flexibility in structuring a proposal for adequate protection.” In re American Mariner Industries, Inc., 734 F.2d 426, 435 (9th Cir.1984).
*475 Nevertheless, an appellate court has the power to correct errors of law, including “a finding of fact that is predicated on a misunderstanding of the governing rule of law.” Bose Corp. v. Consumer Union of United States, — U.S. -, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984); see also Inwood Laboratories v. Ives Laboratories, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982); Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
Discussion
The issues before us, then, are whether the bankruptcy court applied the correct legal standard in finding that debtors’ offer of a substitute lien in the 1984 crop along with an assignment of Federal Crop Insurance proceeds adequately protected CCC’s interest and, if so, whether its determination of adequate protection was clearly erroneous.
It is the debtors’ position that their offer afforded adequate protection. They assert the evidence established that the value of the first lien on the 1984 crop exceeded the value of the collateral being requested from CCC, and that a lack of adequate protection would be realized only if there was a failure of the crop. Because debtors offered to assign CCC the Federal Crop Insurance proceeds, they claim that the risk of crop failure would not affect CCC’s security interest. The Federal Crop Insurance Corporation (FCIC) guarantees up to seventy-five percent of the crop yield, see 7 U.S.C. § 1508(a), and the debtors were authorized to use cash collateral only to the extent of the protection afforded CCC un-. der the Federal Crop Insurance policy.
CCC argues 'that an insured, speculative crop is not of the same value as grain already in the bin. Additionally, CCC states that the debtors’ proposal fails adequately to protect against a possible decrease in the market value of a crop to be harvested in the future. CCC also points out that FCIC insures only against crop failure due to “unavoidable causes.” It does not cover losses due, among other things, to the “neglect or malfeasance of the producer * * * or to the failure of the producer to follow established good farming practices.” 7 U.S.C. § 1508(a).
Although we agree with the district court that the bankruptcy court committed error in determining that CCC’s security interest was adequately protected, we believe that the bankruptcy court’s error was based on a misunderstanding of the law rather than an erroneous determination of the facts. Specifically, the bankruptcy court failed to apply the standard of adequate protection mandated by 11 U.S.C. § 361(3). In reaching this conclusion, we rely primarily on the wording of the applicable statutory provisions and their legislative histories. Under these circumstances, it is appropriate to remand the case back to the district court with instructions to remand to the bankruptcy court to apply the correct standard. See, e.g., Pullman-Standard, 456 U.S. at 292, 102 S.Ct. at 1791. Accordingly, we do not reach the issue of whether the bankruptcy court’s finding that CCC’s interest was adequately protected is clearly erroneous.
Under Chapter 11, the purposes of business reorganization are to “relieve the debtor of its prepetition debts, to free cash flow to meet current operating expenses, and ultimately to permit the debtor ‘to restructure a business’s finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.’ ” American Mariner, 734 F.2d at 431 (quoting H.R.Rep. No. 595 at 220, 1978 U.S.Code Cong. & Ad.News at 6179). The filing of a Chapter 11 petition operates as an automatic stay, which prevents creditors from enforcing their liens against the property of the bankruptcy estate and removing collateral that may be essential to the reorganization, plan. 11 U.S.C. § 362(a).
Section 363(e) of Chapter 11 provides that whenever the bankruptcy trustee proposes to use, sell, or lease property of the bankruptcy estate in which the creditor has an interest, the court shall, at the request of the creditor, “prohibit or condition such use, sale, or lease as is necessary to pro *476 vide adequate protection of [the creditor’s] interest.” Section 361 provides three alternative means for providing adequate protection. 11 U.S.C. § 361. Subsection 1 provides for periodic cash payments; subsection 2 provides for additional or replacement liens. Subsections 1 and 2 are designed to compensate for any decrease in value of a secured creditor’s interest resulting from the use, sale or lease of the debt- or’s property. Subsection 3 provides for “granting such other relief * * * as will result in the realization by [the creditor] of the indubitable equivalent of [its] interest in such property.”
We find the inclusion of the phrase “indubitable equivalent” in section 361(3) most significant. The concept originated from an early bankruptcy case, In re Murel Holding Corp., 75 F.2d 941 (2d Cir.1935), in which Judge Learned Hand explained the meaning of “adequate protection” within the context of the Bankruptcy Act of 1889:
It is plain that “adequate protection” must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.
Id. at 942.
Inclusion of the “indubitable equivalent” concept occurred as the result of a legislative compromise. The original House and Senate versions of section 361 differed in certain important respects. Both bills offered in identical form the two subsections that presently are codified at 361(1) and 361(2). The House version, however, contained two additional methods of providing “adequate protection.”
The first method granted to the secured creditor an administrative expense priority to the extent of his loss. H.Rep. No. 595 at 340, 1978 U.S.Code Cong. & Ad.News at 6296. The Senate, however, deleted this provision, recognizing that “such protection is too uncertain to be meaningful.” S.Rep. No. 989 at 54, 1978 U.S.Code Cong. & Ad. News at 5840. The House bill also permitted the courts to provide other forms of protection “that will result in the realization by the [secured party] of the value of its interest in the property involved.” H.Rep. No. 595 at 340, 1978 U.S.Code Cong. & Ad.News at 6296. The Senate bill did not contain such a provision. S.Rep. No. 989 at 54, 1978 U.S.Code Cong. & Ad. News at 5840.
Subsection 3, in its final form, allows the courts discretion to grant other forms of “adequate protection” to a secured creditor. Although the final draft of section 361(3) is similar to the original House version, the additional requirement that these other forms of adequate protection provide the secured creditor with the “indubitable equivalent” of its present interest is conspicuous. We have recently recognized that a reorganization plan “may be confirmed over the objections of a secured creditor if the plan affords the creditor the ‘indubitable equivalent’ of his claim.” In re Monnier Brothers, 755 F.2d 1336, 1338 (8th Cir.1985).
A review of the legislative history leads us to conclude that a debtor, in structuring a proposal of adequate protection for a secured creditor, “should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.” American Mariner, 734 F.2d at 435. Although the adequate protection standard and its requirement of indubitable equivalence remains constant, whether adequate protection exists in a given case depends upon the nature of the collateral and the nature of the debtor’s proposed use of that collateral.
In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor’s interest. In any given case, the bankruptcy court *477 must necessarily (1) establish the value of the secured creditor’s interest, (2) identify the risks to the secured creditor’s value resulting from the debtor’s request for use of cash collateral, and (3) determine whether the debtor’s adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence. See Ruggiere Chrysler-Plymouth, 727 F.2d at 1019. (“In determining whether a creditor’s secured interests are so protected, there must be an individual determination of the value of that interest and whether a proposed use of cash collateral threatens that value.”)
In this case, the bankruptcy court failed adequately to establish the value of CCC’s security interest. Although the debtors argue that the value of the lien offered on their 1984 crop exceeds in value the amount of cash collateral being requested, their computation of value is based upon their estimation of 1984 crop yields. They present no documentary evidence of proven yields or of expected market price of the 1984 crop. Clearly, market price at the time of harvest is an important factor in calculating value of the 1984 crop, and a calculation of the 1984 crop value is necessary to a determination of whether a security interest in the 1984 crop is the “indubitable equivalent” of a security interest in grain already in the bin. The bankruptcy court itself noted the constant fluctuation of market prices in farm products. This market price analysis addresses the same concern as that addressed in In re Monnier Brothers, 755 F.2d at 1338-40, where an interest award was viewed as necessary to protect a mortgagee from loss of the use of money resulting from the reorganization plan. Additionally, we note that “price support loans which have not been repaid by the maturity date * * * shall bear interest beginning on the date immediately following the maturity date.” 7 C.F.R. § 1421.12(b). The bankruptcy court may want to consider whether CCC is entitled to interest for any delay in repayment occasioned by the debtors’ proposed use of cash collateral.
The bankruptcy court also failed adequately to identify the risks to the secured creditor’s value associated with the planting and harvesting of a crop not yet in existence. A crop failure, unless it is due to “unavoidable consequences” within the meaning of the Federal Crop Insurance policy, would leave CCC’s security interest unprotected. The policy itself specifically disclaims any liability for crop failure resulting from the farmer’s neglect or failure to follow good husbandry practices. On rentgiid, the bankruptcy court should consider: the anticipated yield in light of the productivity of the land; the husbandry practices of the farmer, including his proven crop yields from previous years; the health and reliability of the farmer; the condition of the farmer’s machinery; whether there are encumbrances on the machinery which may subject it to being repossessed before the crop is harvested; the potential encumbrances on the present or future crop by other secured creditors; the availability of crop insurance and the risk of crop failure not covered by the crop insurance; and the anticipated fluctuation in market price of the farmer’s crop. These factors are by no means exclusive but merely illustrative of ones affecting CCC’s security interest.
The concerns we express are not insurmountable. On the contrary, we believe they are in accordance with the policy of balancing the competing interests of a debtor who proposes to use secured property to contribute to the reorganization plan on the one hand, and the creditor who wishes to retain the value and safety of its security interest on the other. After considering the value of the secured creditor’s interest and the risks associated with the debtor’s proposal, the bankruptcy court must ultimately decide whether the debt- or’s adequate protection proposal provides protection to the creditor consistent with the concept of indubitable equivalence. Indubitable equivalence requires “such relief as will result in the realization of value.” See In re Sheehan, 38 B.R. 859, 864 (D.S. D.1984). If the debtor’s proposal provides *478 adequate protection, the request for use of cash collateral should be granted by the bankruptcy court. If the debtor’s proposal can be modified to provide for adequate protection while still remaining useful to the debtor, the debtor’s request should be granted under the modified plan. If adequate protection cannot be afforded under any circumstances, the debtor’s request for use of cash collateral should be denied by the bankruptcy court.
CCC raises an additional claim that an order authorizing the debtors’ sale of grain and use of the cash collateral would be inconsistent with the statutes and regulations concerning its price support programs. See 7 U.S.C. §§ 1421-1449. Specifically, CCC argues that Congress created the CCC for the limited purpose of providing price support programs and not for providing operating loans to farmers. In support of its position, CCC relies on certain regulations governing the actions of CCC. Section 1421.6(b) provides that the CCC cannot disburse a loan “unless the commodity covered by the mortgage or pledge is in existence and in good condition.” 7 C.F.R. § 1421.6(b) (1983). Section 1421.19(a) provides that when liquidating a farm storage loan,
the producer is required to pay off the loan or deliver to CCC a sufficient quantity of the eligible commodity having a price support value equal to or greater than the outstanding balance of the loan. Deliveries may be either of an identical commodity which is subject to the note and security agreement or of other eligible commodity of the same kind and of the same crop year.
7 C.F.R. § 1421.19(a) (1983).
We are not persuaded by CCC’s argument. While the regulations cited by CCC address requirements for the initial disbursement and eventual liquidation of CCC loans, they do not address the debtors’ situation in this case. Here, the debtors are requesting CCC to accept a replacement lien for its security interest in existing grain as any other secured creditor would be required to do if the debtors offer adequate protection of the secured creditor’s interest.
Nor do any provisions in the Bankruptcy Code lead us to conclude that Congress intended CCC to be treated differently from other secured creditors seeking adequate protection of their security interest as provided for in section 363 of the Bankruptcy Code. Section 363 applies to all entities who have an interest in the bankruptcy estate, and the term “entity” includes governmental units. See 11 U.S.C. §§ 101(14), 106(c). We conclude that CCC, as a governmental unit, is bound by the provisions of section 363 to the same extent as any other secured creditor. Cf. United States v. Whiting Pools, Inc., 462 U.S. 198, 209, 103 S.Ct. 2309, 2315, 76 L.Ed.2d 515 (1983) (Recognizing that the Bankruptcy Code expressly states that the term “entity” used in section 542(a) includes a governmental unit, 11 U.S.C. § 101(14), the Court held that the Internal Revenue Service is bound by section 542(a) of the Bankruptcy Code to the same extent as any secured creditor.).
Conclusion
Although we conclude that the ultimate determination of adequate protection is a question of fact subject to the clearly erroneous standard of review, we believe that the bankruptcy court “accordfed] insufficient weight to the language of the statute and the Congressional goal of affording the secured creditor the benefit of its bargain.” American Mariner, 734 F.2d at 434-35. Accordingly, we remand this case to the district court with instructions to remand to the bankruptcy court.
On remand, the bankruptcy court should initially decide whether an adequate protection determination will have any practical effect at this time. This will depend upon an evaluation of the individual debtors’ situations: are they still in possession of the land; have they made other financial arrangements for the current crop year; have arrangements been made for someone else to farm their land in the current year. If the bankruptcy court concludes that an *479 adequate protection determination will have present significance, it should then proceed to apply the correct legal standard and consider additional evidence in light of this opinion.